## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ESTATE OF GLADYS LONDONO,
DECEASED, by and through JUAN
CARLOS RUBIO, and JUAN CARLOS
RUBIO, individually,

        **Plaintiffs**

vs.                                                  NO. 05cv92  WDS/RHS

HONEYWELL INTERNATIONAL INC.,

        **Defendant**

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on multiple motions in limine filed by the Plaintiffs and the Defendant in this case. Both parties have filed motions seeking to exclude certain evidence or limit the testimony of certain expert witnesses. Additionally, Defendant has filed a motion for summary judgment. The Court will address the evidentiary issues first, and then address Defendant's motion for summary judgment.

### FACTS[1]

Gladys Londono was killed in a house fire on the morning of February 25, 2004. Her home was equipped with a Honeywell TC49D smoke detector. The estate of Gladys Londono filed suit against Honeywell, alleging that the smoke detector was defective, and that the defect in the smoke detector caused Ms. Londono's death.

---

[1]The Court notes that Defendant's Motion for Summary Judgment included a numbered statement of facts with citations to the record in support of those facts. Plaintiffs' opposition brief did not admit or deny those facts as required by Local Rule 56.1(b). Under the rule, facts that are not denied are deemed undisputed. Nevertheless, the Court has reviewed the record and the facts stated below appear to be actually undisputed.

Ms. Londono lived in a one-story home that she purchased in 1994.  The home was built in approximately 1980.  When Ms. Londono bought the home it came with a Honeywell TC49D smoke detector installed on the wall of the main hallway.  There is no evidence that Ms. Londono received or read an instruction booklet for the smoke detector.  The smoke detector was wired into the home's electrical system.  The manufacturing date on the smoke detector was illegible after the fire, but Honeywell ceased manufacturing the TC49D in December 1980.  The parties appear to have proceeded under the assumption that the smoke detector was manufactured around the time the home was built, and was installed in the house at the time it was built.

Ms. Londono rented a bedroom to a family friend, Maria Acosta, who stayed at the house between nursing assignments but was not in the home on the night of the fire.  Ms. Londono ran a day care center in her home.  New Mexico Family Services regulations for home day care facilities require inspections of the facilities, including testing of smoke detectors.  On February 12, 2004 Peggy Waconda inspected Ms. Londono's home on behalf of Family Services.  Ms. Londono used a broomstick to push the "test" button on the Honeywell smoke detector in her hallway, and the detector sounded.

Several weeks before the fire, Ms. Londono had purchased a security gate and had it installed on her front door.  Ms. Londono used a key to lock and unlock the gate.  Ms. Londono kept her keys in her purse, which she kept in a closet in her bedroom.

During the evening of February 24, 2004 Ms. Londono was home alone.  She spoke to her son on the telephone around 8:30 p.m., and spoke to her sister at about 10:00 p.m.  Shortly before 4:26 a.m. on February 25, 2004, a passerby was driving near Ms. Londono's home and noticed smoke.  She honked her horn and shouted, and woke up Ms. Londono's neighbors.  The neighbors

saw flames and smoke coming from Ms. Londono's home.  The fire department was called, and several of the neighbors approached the front door of the house in an effort to call to Ms. Londono. The neighbors found both the security gate and the front door unlocked.  There is conflicting testimony from the neighbors regarding whether any lights, or some lights were on inside or outside the Londono home.  None of the neighbors heard a smoke detector sounding.

The fire department was notified at 4:26 a.m. and the first responders arrived at 4:36 a.m. Rescue personnel found Ms. Londono's body about three feet from the front door in the foyer of the home shortly after their arrival at the scene.  They did not attempt resuscitation because there were no signs of life and the body was already in a state of rigor mortis.  Ms. Londono's house keys were found on the floor near the body.  She was fully clothed and wearing slippers.

The fire was controlled by 5:45 a.m.  Although the cause and origin of the fire is vigorously contested[2], photographs show that the fire damaged furnishings in the family room at the rear of the house, and destroyed nearly all of the attic and roof from the area of the center hall to the rear of the house.  The fire department found circuit breaker #2 tripped.  According to the label on the electrical panel, circuit breaker #2 protected the heater and air conditioner.

Plaintiff retained a cause and origin expert, Don Naylor, and an electrical engineer, Robert Moran, to inspect the scene of the fire.  The experts removed the smoke detector from the wall of Ms. Londono's home, where it had been damaged by the heat of the fire.  None of Plaintiffs' experts performed any tests on the unit.  The smoke detector was tested on August 15, 2005 at Honeywell's

---

[2]The fire department concluded that the fire started in the attic, but the ignition source was undetermined.  Honeywell agrees, at least substantially, with the fire department report.  Plaintiffs take the position that the fire started in a night light plugged into the west wall of the family room, and thereafter spread to the attic.

Golden Valley facility in Minnesota.  Honeywell's expert John Forss was present, as was Mr. Moran, plus counsel.  Mr. Forss connected the smoke detector to a 120 volt source, and the "power on" light illuminated.  The device sounded when the "test" button was pushed.  Mr. Forss brought a burning piece of paper near the device's sensing chamber, and the alarm again sounded.

Mr. Moran performed an electrical inspection of the fire damaged residence.  Mr. Moran observed that electrical wires were burned through and broken in places, and that the unbroken wires in the area of fire damage had essentially all insulation burned off.  Mr. Moran also observed that several circuit breakers in the electrical panel were turned off, and one circuit breaker was possibly tripped.  Mr. Moran made no attempt to trace any wiring in the house, either to determine whether the wires from the electrical panel to the smoke detector were intact, or to determine which electrical circuit included the smoke detector.

Mr. Moran noted a wall clock on the floor in the breakfast area with a charred battery nearby. He tested the battery and determined that it had enough power to operate the clock.  The hands of the clock showed a time of 1:55.  Mr. Moran did not determine a specific cause of the fire.

Patrick Pagni is a mechanical engineer retained by Plaintiffs to reconstruct the fire at the Londono home.  Mr. Pagni used a fire modeling program to calculate temperatures, oxygen and carbon monoxide levels, and smoke density.  Mr. Pagni opines that the fire smoldered in the family room, starting probably between 11:00 p.m. and 1:00 a.m. and smoldering for perhaps two hours before transitioning to a flaming fire for approximately half an hour.  The modeling program used by Mr. Pagni is suitable only for flaming fires, and Mr. Pagni's modeling results suggest that smoke from the flaming fire would have reached the smoke detector in sufficient density to sound the alarm within 60 or 83 seconds of the transition to a flaming fire.  Mr. Pagni is of the opinion that the smoke

detector did not sound an alarm.

Steven Packham is a toxicologist retained by the Plaintiffs.  Mr. Packham offers the opinion that Ms. Londono died between 2:17 a.m. and 3:01 a.m.  Mr. Packham relies in part on Mr. Pagni's fire modeling, as well as on the wall clock showing a time of 1:55.  Mr. Packham opines that the fire conditions and the failure of the smoke detector to sound a timely warning led to Ms. Londono's death.  Mr. Packham and Mr. Pagni are both of the opinion that Ms. Londono was able to get to the front door and unlock it, but was overcome by smoke before she could exit the house.  Neither Mr. Packham nor Mr. Pagni have any specialized knowledge regarding smoke detectors.

Plaintiffs retained B. Don Russell as an expert on smoke detector operation.  Mr. Russell has done extensive testing of smoke detectors, however he did no testing of the particular unit that was in Ms. Londono's home, nor has he tested any exemplars of the Honeywell TC49D.  Mr. Russell notes that the TC49D is an ionization smoke detector.  Photovoltaic smoke detectors are also marketed, and Mr. Russell is of the opinion that photovoltaic smoke detectors typically respond more quickly to smoldering fires than do ionization detectors.  Mr. Russell opines that the Honeywell smoke detector in Ms. Londono's home was defectively designed and either failed to sound an alarm or failed to sound a timely alarm.

John Forss is a former Honeywell engineer who now operates an engineering consulting business.  He was retained by Honeywell as an expert on smoke detectors.  He offers the opinion that the TC49D unit is a well designed and manufactured product that was accompanied by appropriate instructions and warnings; that the unit in Ms. Londono's home responded to the fire in a timely manner; and that Ms. Londono was alerted to the fire, opened the front door and security gate, left the house, and then re-entered for unknown reasons only to succumb to smoke inhalation.

5

Honeywell also retained Richard Dyer, Chief of the Kansas City Fire Department, as a fire investigator. Mr. Dyer offers the opinion that the fire started in the attic or patio ceiling near the west wall of the residence, and smoldered there until it transitioned to a flaming fire and broke through the ceiling into the family room. Mr. Dyer believes that the attic fire produced carbon monoxide which was transported into the living area by the heating system. Mr. Dyer also believes that Ms. Londono escaped the home, only to be overcome by smoke when she re-entered the dwelling.

Christopher Wood was also retained by Honeywell to investigate the fire. Mr. Wood places the origin of the fire in the attic space, and offers criticism of the fire modeling performed by Plaintiffs' experts. Mr. Wood disputes the Plaintiffs' contention that the smoke detector failed to sound an alarm, and disputes the Plaintiffs' criticism of ionization technology as applied in smoke detectors. Mr. Wood also believes that Ms. Londono exited the house, only to return and be overcome by smoke.

All of the defense experts point to the unlocked security gate as evidence that Ms. Londono was able to leave the house successfully. All of Plaintiffs' experts discount the significance of the unlocked security gate, noting that they have no knowledge whether it was locked or unlocked at the time the fire started.

## MOTIONS IN LIMINE

As an initial matter, the Court will address certain of the Daubert motions filed by the parties. Both parties have filed motions seeking to strike expert testimony regarding Ms. Londono's behavior during the fire. Plaintiffs seek to strike Defendant's expert's testimony that Ms. Londono left the house safely, only to re-enter the house and be overcome by smoke. Defendant seeks to strike Plaintiffs' expert's testimony that Ms. Londono never left the house, and that she would have done

6

so had the smoke detector sounded a timely alarm.  Both parties have accurately stated the relevant

law on the issue of expert testimony, Fed. R. Evid. 702:  An expert's testimony must have a reliable

basis in the knowledge and experience of the expert's discipline, it must be relevant, and it must assist

the trier of fact in understanding the evidence.

It is the Court's opinion that none of the experts are competent to offer expert opinion on the

issue of whether Ms. Londono did or did not exit and then re-enter her house during the fire.  There

is no question of fact that the security gate was unlocked when Ms. Londono's neighbors were made

aware of the fire at approximately 4:30 a.m. on the morning of the fire.  However, the conclusion to

be drawn from that fact is hotly disputed, and in this instance no expert has offered testimony in his

area of expertise that would assist the trier of fact in drawing a conclusion.  Defendant's counsel can

certainly argue that the fact that the gate was unlocked would justify an inference that Ms. Londono

left the house and then re-entered it.  Plaintiffs' counsel, in response, can argue that the appropriate

inference to be drawn is that Ms. Londono simply failed to lock the security gate before going to bed,

pointing out that she would have had no reason to re-enter the house once she escaped the fire, and

that she would have had no reason to close the front door behind her had she re-entered the house.

These are all legitimate arguments to be made by counsel, but no expert has presented  facts that

would make either inference more likely than the other.

In the Court's opinion none of the experts presented in this case have the required expertise

to testify as an expert on human behavior in this case such that they could qualify to offer an opinion

that Ms. Londono did or did not leave the residence during the fire. Expertise in cause and origin

investigation, or electrical engineering, or toxicology, or smoke detector operation, or fire modeling

does not presume expertise in human behavior.  Furthermore, the Court notes that none of the experts

are even attempting to apply the expertise they have to the issue of whether Ms. Londono left the house or not.  The Defendant's experts, Mr. Forss, Mr. Dyer, and Mr. Wood, all point to the unlocked gate as support for their "opinion" that Ms. Londono left the house, but it is clear from the record that this "opinion" is not informed by some particular scientific knowledge they have, but is simply lay opinion.

Similarly, Plaintiffs' experts offer no specialized knowledge to support their opinion that Ms. Londono did not leave her house during the fire.  Dr. Pagni simply states that had she been awakened in a timely manner by the smoke detector, she would have left the house and remained outside.  He provides no scientific basis for the proposition, but merely assumes it as a factual basis for the remainder of his report.  Dr. Pagni's proffered testimony is essentially the inverse of the testimony offered by Defendant's experts, and fails for the same reason:  while a reasonable fact finder might conclude, after reviewing the circumstantial evidence in the case, that Ms. Londono would have left the house and stayed outside has she been awakened by the smoke detector, and while Plaintiffs' counsel can certainly argue such, Plaintiffs' experts cannot add the imprimatur of "expert testimony" to such an argument when they have neither the facts nor the specialized knowledge necessary to render their opinion any more valid than the opinion of a layman.  Such testimony would not assist the trier of fact.

Accordingly, all expert testimony regarding the issue of whether Ms. Londono did or did not leave the house on the night of the fire, or whether she did or did not re-enter the house, is stricken.

In a similar vein, both parties have filed motions to suppress the testimony of the other side's experts as to whether the smoke detector did or did not sound an alarm, or whether it sounded a timely alarm.  The Defendant's three experts all express the opinion that the alarm sounded, causing

Ms. Londono to get out of bed, put on her slippers, get her keys and exit the house, albeit to re-enter and perish in the fire.  Plaintiffs object to this testimony, arguing that Defendant's experts did no relevant testing that would support the proposition that the smoke detector sounded.  Plaintiffs point out, for example, that the experts did not trace wiring or check the circuit breakers at the house, or test the smoke detector under conditions that closely replicated the conditions in the Londono home. The Court agrees that, for those reasons above on whether Ms. Londono left the house or not, and for additional reasons set forth below, the proffered testimony by Defendant's experts that the alarm sounded in a timely way is not admissible.

Plaintiffs' experts are equally incapable, for the same reasons, of voicing the opinion that the smoke detector did *not* sound.  With the exception of Mr. Russell, Plaintiffs' experts have no technical expertise whatsoever regarding the operation of smoke detectors.  Mr. Pagni's testimony regarding his opinion that the smoke detector did not sound an alarm is illustrative of the overall deficiency of the proffered evidence:

Q:      What is the basis for you claiming that the smoke detector did not alarm?

A:      I think if it had alarmed, Mrs. Londono would have exited the house in time.

Q:      . . .So in other words, the fact that she did not escape the house is on what you base your opinion the smoke detector did not alarm?

A:      Yes.

Similarly, Mr. Packham's opinion that the smoke detector did not sound a warning is based purely on the fact that Ms. Londono did not survive the fire.  However, it is evident that something caused Ms. Londono to get up, as she was found by the front door with her slippers and her keys. And, as noted above, no expert sufficiently established that Ms. Londono did or did not leave the

house, so Pagni and Packham's reliance on the assumption that she did not leave the house renders all subsequent assumptions baseless. Furthermore, while Plaintiffs' experts base their opinions on the assumption that Ms. Londono moved directly to the front door once she became aware of the fire, there is simply no evidence upon which to base such an assumption. What is being offered as an "opinion" here is no more than conclusory argument, which might be appropriate for counsel in closing but which does not constitute expert testimony and would not assist a trier of fact.

Mr. Russell, on the other hand, did no testing of the smoke detector or any exemplars that would support the proposition that the smoke detector did not sound. At his deposition he speculated that an ionization detector such as the TC49D might become "desensitized" under certain fire and smoke conditions, however he admitted that he had never done the testing to verify this speculation, and that he really had no idea how such testing would be done.

Plaintiffs try to advance the position that the smoke detector did not sound by citing the testimony of neighbors who did not hear the smoke detector sounding when they were outside the house at 4:30 a.m. The Court accepts that evidence on its face, but finds that it is not relevant to the question of whether the smoke detector sounded a warning at a relevant time, i.e. a warning at the early stages of the fire. By Plaintiffs' own time line, that warning would have had to sound before 1:55 a.m., at least two and a half hours and possibly three or four hours before the neighbors arrived outside the house. During that intervening time a fire burned in the attic and family room, destroying electrical wiring and tripping one circuit breaker. Plaintiffs' electrical expert observed the damaged wiring, but made no effort to determine whether the wiring for the smoke detector had been compromised. For that matter, the Plaintiffs' electrical expert made no attempt to determine what circuit the smoke detector was on, despite the fact that he observed one circuit breaker tripped and

other circuit breakers turned off.

Furthermore, while Plaintiff is critical of Defendant's experts for not tracing wiring, there is no question that the burden of proof is on the Plaintiff. Had Mr. Moran traced the wiring for the smoke detector, found it intact, and found the breaker in the "on" position, the neighbors' testimony may have been admissible and probative. Had Mr. Moran traced the wiring for the smoke detector and found it burned and broken, or found the circuit breaker off or tripped, the neighbor's testimony would have had little or no probative value. In the absence of any evidence regarding the condition of the wiring to the smoke detector, a trier of fact could only speculate why it was not sounding an alarm at 4:30 a.m., hours after the fire started. Such speculation is not permissible.

Defendant seeks to strike all testimony proffered by Plaintiff regarding a battery powered clock that was found at the fire scene. At the time the clock came into Plaintiffs' possession its hands indicated a time of 1:55. A charred battery was found on the floor near the clock. It was tested and found to have sufficient power to operate the clock. There is evidence that the glue holding the clock's frame together melted in the fire, causing the clock mechanism to fall to the floor. Plaintiffs offers the clock as evidence that the heat of the fire caused the clock to fall off the wall at 1:55 a.m. Further, Plaintiffs offers the expert testimony of Mr. Pagni, who analyzed glue melting temperatures and rates of heating to conclude that the clock would have fallen off of the wall approximately 25 minutes after the original smoldering fire transitioned to a flaming fire. Accordingly, Mr. Pagni opines that the fire made a transition from smoldering to flaming at approximately 1:30 a.m.

Defendant objects that the Plaintiffs have not established a sufficient foundation to admit the clock evidence, arguing that there is insufficient evidence that the clock was operating and showing the correct time before the fire. The Court acknowledges the possibility the clock was not set at the

right time before the fire, but finds that that mere possibility does not outweigh the probative value of the evidence.  Accordingly, Defendant's motion in limine on this subject is denied.

Plaintiffs move to bar the admission of evidence regarding post-fire testing of the smoke detector.  The detector was tested by John Forss, at Honeywell's facility, in the presence of Plaintiffs' attorney and expert witness.  The testing was two-fold.  First, the smoke detector was connected to a 120 volt power supply, and the "test" button was pushed.  The smoke detector sounded.  A piece of paper was then lit, and held under the smoke detector.  Again, it sounded.

Plaintiffs have filed a *Daubert* motion to strike this evidence, arguing that it is unreliable testing that did not recreate the circumstances present in Ms. Londono's house at the time of the fire. Plaintiffs further argue that Defendant did not follow the testing protocol that it normally uses to test its products.  Defendant responds by noting that heat damage to the smoke detector's cover  made it impossible to test the device using the normal protocol.

As an initial matter, the Court notes that, while there are *Daubert* aspects to Plaintiffs' motion, it is not purely a *Daubert* motion.  The expert testimony that Plaintiffs seek to preclude is not opinion testimony, but factual testimony, i.e., that the smoke detector sounded after the fire when it was connected to power and the "test" button was pushed, and that it sounded when a flaming piece of paper was held under it.  This factual evidence is clearly relevant to the significant issue of whether the smoke detector could have responded to the fire, i.e., whether it was in working order at the time the fire broke out.  The smoke detector had been tested approximately two weeks before the fire, and had sounded an alarm.  That test, however, would not rule out the failure of a component of the smoke alarm in the intervening two weeks before the fire.  The tests that are the subject of this motion are relevant to the issue of whether the detector was still in working order at the time of the fire, and

whether it was capable of sounding an alarm to warn of a fire.

The Court agrees with Plaintiffs that the tests are not a scientific recreation of the fire environment in Ms. Londono's house, and the evidence would not be admissible to illustrate how the detector reacted to the fire in the house.   However, the Court notes that one of Mr. Russell's criticisms of the Honeywell TC49D is that it had too many single point failure modes, or a lack of redundancy.  Mr. Russell noted that if a single wire failed, the horn, for example, would not sound an alarm.  In view of this criticism it is certainly appropriate for Defendant to present evidence that before and after the fire the particular unit was functioning and able to sound an alarm.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Court now turns its attention to Defendant's Motion for Summary Judgment.  New Mexico has adopted the Restatement 2nd of Torts to govern product liability actions. *Martin v. Unit Rig & Equipment Co., Inc.*, 715 F.2d 1434 (10th Cir. 1983); *Smith v. Bryco Arms*, 131 N.M. 87(Ct. App. 2001).  A plaintiff must prove a defect in the product, a causal relationship between the defect and the injury suffered, and that there were no substantial changes to the product. 715 F.2d at 1439. Here, no issue has been raised about post-manufacturing changes to the product, nor is there a dispute about the injury suffered by Ms. Londono.  Accordingly, the focus of the Court is on whether Plaintiffs have met the burden of raising a triable issue regarding whether the smoke detector was defective, and whether the defect, if any, caused Ms. Londono's death.

There is also no question that the proof in this case is circumstantial.  New Mexico allows proof of defect and causation through circumstantial evidence, if the plaintiff can establish that the facts and circumstances, together with the inferences that may be legitimately drawn therefrom, indicate with reasonable certainty that the product was defective and that the defective product

caused Plaintiffs' damages.  *Carter Farms Co. v. Hoffman-Laroche, Inc.* 83 N.M. 383 (Ct. App. 1971).  To support a jury verdict, evidence must be based on more than mere speculation, conjecture, or surmise. See *Brown v. Reardon*, 770 F.2d 896, 904 (10th Cir. 1985). It naturally follows that the inferences drawn from circumstantial evidence must also be based on something more than speculation, conjecture, or surmise.  See *Mitchell v. Machinery Center, Inc.*, 297 F.2d 883 (10th Cir. 1962)("An inference is not a supposition or a conjecture, but is a logical deduction from facts proved and guesswork is not a substitute therefore.").

Defendant's position is that Plaintiffs have not established that the smoke detector was defective or that it caused Gladys Londono's death.  The question for the Court is whether, in view of the evidentiary rulings above, there is sufficient circumstantial evidence to support the inference that the TC49D failed on the morning of the fire, causing Ms. Londono's death.  Most significant from the perspective of evaluating the merits of Plaintiffs' case is the weight which Plaintiffs place on the observations of witnesses who arrived at the Londono home hours after Ms. Londono was overcome by smoke.  As noted above, Plaintiffs made no effort to examine or test the house's electrical system to establish that the condition of the system at 4:30 a.m. was the same as at the onset of the fire hours before.  Plaintiffs note that a witness testified that she looked through the front door of the home around 4:30 a.m. and saw a glow towards the floor of the hallway.  Plaintiffs suggest there is evidence that a nightlight was plugged into a socket in the front hallway, with the inference being that there was electrical power to that circuit at 4:30 a.m.  This might have been significant testimony had Plaintiffs' electrical expert established, or even attempted to establish, that the smoke detector and the electrical socket in the hallway were on the same electrical circuit.

However, the Plaintiffs made no such effort.  To the contrary, Plaintiffs seem to take the

14

position that it was Defendant's responsibility to examine the electrical system of the house and prove that the smoke detector was *not* powered at 4:30 a.m.  This, of course, stands the accepted burden of proof on its head.  In fact, Plaintiffs argue in response to Defendant's motion that there is not a scintilla of evidence whether the wires in the attic were destroyed before, during or after the first responders arrived.  The Court agrees with Plaintiffs' assessment of the evidence on this issue, however in the Court's opinion it was Plaintiffs' obligation to develop such evidence if Plaintiffs had any intention of getting the testimony of the first responders admitted.  Even after noting that circuit breakers were turned off or tripped at the electrical panel, Plaintiffs made no effort whatsoever to determine whether the smoke detector was on one of those circuits.  As the case stands now, a fact finder could only speculate regarding the significance of the fact that the smoke alarm was not sounding at 4:30 a.m., and such speculation is impermissible.  It is clear to the Court that, given the state of the evidence in this case, the fact that the smoke detector was not sounding at 4:30 in the morning would not support *any* inference as to what the smoke detector was doing three or four hours before.

Furthermore, the Court notes that what would be a difficult circumstantial case for Plaintiffs is made more difficult by the evident fact that *something* caused Ms. Londono to be out of bed, in her slippers, with her keys, by the front door during the fire.  This fact, coupled with the fact that the smoke detector was operable both before and after the fire, creates not only a permissible inference, but a rather strong inference, that smoke detector sounded an alarm[3].  With the exclusion of the

---

[3]Plaintiffs respond by accurately noting that none of Honeywell's witnesses can state as a *fact* that it was the alarm that alerted Ms. Londono to the fire.  This is true, but not relevant in a case built on circumstantial evidence where the issue is what *inferences* can be drawn from known facts.  In this case the *fact* is that something alerted Ms. Londono, causing her ultimately to be in her slippers, with her house keys, by the front door.   The permissible *inference* is that it was the

testimony of the first responders, and the exclusion of the purported expert testimony regarding whether Ms. Londono left the house and whether the alarm sounded, there is simply no competent evidence, circumstantial or otherwise, from which a fact finder could draw an inference that the smoke detector did not sound an alarm at all.

That leaves the Court with the issue of whether the TC49D sounded a delayed alarm. Plaintiffs' expert Mr. Russell is clearly of the opinion that ionization smoke detectors generally do not respond as quickly to smoldering fires as photoelectric detectors do.  However, the Court notes that Mr. Russell did no testing of the particular detector that was in Ms. Londono's home, nor did he do any testing, before or after the fire, of Honeywell ionization smoke detectors.  This is fatal in a circumstantial case such as this where a trier of fact is supposed to draw inferences from the underlying facts.  Mr. Russell made no effort whatsoever to establish that Honeywell ionization detectors are slower to respond to fires than other ionization detectors, nor did he rule out that Honeywell ionization detectors respond more quickly to fires than other ionization detectors.  Mr. Russell acknowledges that ionization detectors respond more quickly in certain circumstances than photovoltaic detectors do.  More significantly, perhaps, Mr. Russell and Plaintiffs' counsel have simply assumed that Ms. Londono was alerted to the fire, moved expeditiously to the front door, and was overcome by smoke after unlocking the front door but before opening the door.  There is simply no evidence what Ms. Londono did in the house after she was alerted to the fire (other than put on her slippers and get her keys, and there is no evidence how long that took) and there is evidence, in the form of the unlocked security gate, that she might have left the house and re-entered it.  Given the paucity of actual facts, a finding of liability in this case would not be based on anything other than

smoke detector.

speculation, conjecture, or surmise.

It is unclear whether Mr. Russell is attempting to establish a theory of class defect regarding all ionization smoke detectors, in other words, that the mere fact that a detector used ionization technology rendered it *per se* defective. This lack of clarity might result from Plaintiffs' misplaced reliance on the theory that the detector did not sound at all. Regardless, Mr. Russell's report and testimony are insufficient to establish that the Honeywell TC49D was unreasonably dangerous and defective due to lack of sensitivity to smoke, whether from a flaming or smoldering fire. Furthermore, although Mr. Russell mentioned the existence of combination detectors--detectors using both ionization and photovoltaic technology--he presented no evidence that this would have been a commercially viable design at the time the TC49D was manufactured in 1979 or 1980. See *Morales v. E.D. Etnyre & Co.*, 382 F. Supp. 2d 1278 (D.N.M. 2005); *Smith v. Bryco Arms*, 131 N.M. 87(Ct. App. 2001).

## CONCLUSION

This case presents a tragic set of circumstances, in that Gladys Londono did not survive a fire in her home on the morning of February 25, 2004. From the start, Plaintiffs faced significant evidentiary hurdles arising from the fact that no occupant of the house survived the fire, and that Ms. Londono was overcome by smoke and died hours before any witness even became aware of the fire. For a circumstantial case such as this to get to a jury there must be some evidence from which a trier of fact could make the required inferences to support a finding of liability on the part of the Defendant without resorting to speculation, conjecture, or surmise. The required evidence is not present in this case, and the Court hereby enters summary judgment in favor of Defendant, dismissing Plaintiffs' claims.

**W. DANIEL SCHNEIDER**
**UNITED STATES MAGISTRATE JUDGE**